# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEVERSINK GENERAL STORE, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br>  v.<br><br>MOWI USA, LLC, and MOWI DUCKTRAP, LLC,<br><br>        Defendants. | **CASE NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Neversink General Store ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its Class Action Complaint against Defendants, Mowi USA, LLC, and Mowi Ducktrap, LLC, ("Mowi" or "Defendants"), alleges the following based upon personal knowledge as to itself and its own action, and, as to all other matters, alleges, upon information and belief and investigation of its counsel, as follows:

## NATURE OF THE ACTION

1.    This is a consumer class action brought individually by Plaintiff and on behalf of all persons in the below-defined proposed Classes, all of whom purchased smoked Atlantic salmon products marketed under the brand name Ducktrap River of Maine (hereinafter the "Products").

2.    In the course of its advertising and marketing the Products, Defendants made certain material representations to consumers, including that the Products are (1) sustainably sourced ("Sustainability Representations"), (2) all natural ("Natural Representations"), and (3) sourced from Maine ("Maine Representations").

3.    Defendants' Sustainability Representations lead consumers, including Plaintiff, to believe that the Products are "sustainably sourced," "farm[ed] sustainably," "environmentally

sustainable," and "eco-friendly," and thus suggest to consumers that the Products are made from salmon that are sustainably sourced in accordance with higher environmental and animal welfare standards.

4.      In truth, the Products are made from salmon industrially farmed using unsustainable and environmentally unfriendly practices.

5.      Defendants' Natural Representations lead consumers to believe that the Products are "All Natural" or "100% natural," and thus suggest to consumers that the Products are made from salmon that are not treated with artificial chemicals.

6.      In truth, the Products are made from salmon that are treated with artificial chemicals such as antibiotics and pesticides.

7.      Defendants' Maine Representations lead consumers to believe that the Products are "from Maine" and "from the coast of Maine," and thus tend to suggest to consumers that the Products are made from salmon that are from Maine or off the coastline of Maine.

8.      In truth, the Products are made from salmon industrially farmed outside of the United States.

9.      In other words, Defendants' marketing of the Products is false and misleading.

10.     As a result of Defendants' unlawful and deceptive conduct, Plaintiff and Members of the proposed Classes have been and continue to be harmed, by purchasing a product under false pretenses and paying more for it than they otherwise would have paid, if at all.

11.     Plaintiff and the proposed Classes thus bring claims for consumer fraud, breach of warranty, common law fraud and unjust enrichment and seek damages, injunctive and declaratory relief, interest, costs, and reasonable attorneys' fees.

## PARTIES

12.     Plaintiff, Neversink General Store, is a business located in Neversink, New York, and is a member of the proposed Classes defined herein.  Plaintiff purchased the Products for personal use at the General Store during the two years preceding the filing of this Complaint and most recently in or around September of 2020.  Plaintiff and members of the proposed Classes suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices of Defendant set forth in this Complaint.  Plaintiff and members of the proposed Classes would not have purchased the Products had they been accurately labeled.

13.     Defendant, Mowi USA, LLC, is a limited liability company with its principal place of business in Medley, Florida.  It produces and delivers fish, including the Products, on behalf of its affiliate Mowi Ducktrap, LLC.  Mowi USA, LLC is a wholly owned subsidiary of Mowi ASA, a Norwegian seafood company.  Mowi USA, LLC, either directly or through subsidiaries, receives farm-raised salmon daily from Norway, Canada, Chile, and other fish farms around the world at its Miami and Dallas locations, processes the seafood at its 100,000 square foot headquarters facility in Medley, Florida and at its Arlington, Texas facility, and distributes it to wholesalers, retailers, and others in Florida and across the country.

14.     Defendant Mowi Ducktrap, LLC a/k/a Ducktrap River of Maine, LLC ("Mowi Ducktrap"), is a Maine limited liability company with its principal place of business in Belfast, Maine.  Mowi Ducktrap, LLC is a wholly owned subsidiary of Mowi ASA, and it receives the majority of its farm-raised salmon from Mowi ASA-owned farms in Scotland, Norway, Iceland, and Chile. Mowi Ducktrap processes the farm-raised salmon, through brining and/or smoking, and sells the farm-raised salmon through a variety of trade names such as Kendall Brook, Spruce Point, Winter Harbor, Ducktrap River, and Ducktrap River of Maine.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 (hereinafter referred to as "CAFA") codified as 28 U.S.C. § 1332(d)(2) because the claims of the proposed Class Members exceed $5,000,000 and because Defendants are citizens of a different state than Plaintiff and most proposed Class Members.

16.    The Court has personal jurisdiction over Defendants because Defendants regularly conduct business in this District and/or under the stream of commerce doctrine by causing products to be sold in this District, including the Products purchased by Plaintiff.

17.    Venue is proper because a substantial portion of the events complained of occurred in this District and this Court has jurisdiction over the Defendants.

## FACTUAL ALLEGATIONS

18.    Mowi, through its parent company Mowi ASA, is the world's largest producer of farm-raised salmon,[1] which includes the Products,[2] fulfilling one-fifth of global demand for farm-raised salmon.

19.    Mowi advertises, markets and/or sells the Products at brick and mortar grocery stores and through online retailers throughout the U.S.

20.    In the course of its advertising and marketing of the Products, Mowi made the Sustainability Representations ("sustainably sourced," "farm sustainably," "WE CARE for the ecosystem," "environmentally sustainable," and "eco-friendly,"); Natural Representations ("All Natural" and "100% All Natural"); and Maine Representations ("Naturally Smoked Salmon FROM MAINE" and "from the coast of Maine").[3]

---

[1] *Premium Sustainable Salmon,* Mowi, https://mowi.com/about/ (last visited July 28, 2020).
[2] Discovery may reveal that additional Mowi brands and products should be included within the scope of the allegations in this Complaint, and Plaintiff reserves the right to add such products.
[3] *Healthy and Delicious Seafood,* Mowi, https://mowi.com/products/ (last visited July 28, 2020); Ducktrap River

21.     In making these representations, Mowi led consumers to believe, among other things, that (i) the Products are made from salmon that are sustainably sourced in accordance with higher environmental and animal welfare standards; (ii) the Products are made from salmon that are all natural and not treated with artificial chemicals; and (iii) the Products are made from salmon that are sourced from Maine or off the coastline of Maine.  Unbeknown to consumers, including Plaintiff, these representations are false and misleading.

**I.     Mowi's Sustainability Representations are False and Misleading.**

     **A.     Mowi's Sustainability Representations.**

22.     As shown in the following image, Mowi prominently represents on the packaging of the Products the claim that they are "***Sustainably sourced*** premium quality Atlantic Salmon":



<hr />

of Maine, http://ducktrap.com/ (last visited July 28, 2020); *Smoked Salmon,* Ducktrap River of Maine, http://ducktrap.com/products/smoked-salmon/ (last visited July 28, 2020).

23.    In addition, Mowi makes representations throughout Ducktrap's online marketing and social media that lead consumers to believe that the Products are sustainably sourced.

24.    For example, a Ducktrap YouTube page states: "All our seafood is **sustainably sourced**…."[4]

25.    The Ducktrap Facebook and Instagram pages likewise state: "#Ducktrap is committed to **farm sustainably** and responsibly source seafood to feed the world with a healthy protein."[5]

26.    The Ducktrap Facebook and Instagram pages state: "**WE CARE for the ecosystem** and source only the best healthy seafood."[6]

27.    Mowi has also represented that the Products are "eco-friendly" and "environmentally sustainable".

28.    For example, the Ducktrap Facebook page states: "Happy Earth Day!  Ducktrap River of Maine is committed to being an **eco-friendly** seafood company.  One way we do our part in maintaining a clean planet is sourcing **environmentally sustainable** salmon"[7]

**B.    Mowi's Sustainability Representations Lead Reasonable Consumers to Believe that the Products are Made from Salmon that are Sustainably Sourced in Accordance with Higher Environmental and Animal Welfare Standards.**

29.    The Federal Trade Commission ("FTC") has acknowledged that the terms "sustainable" and "eco-friendly" can be "interpreted to imply certain specific environmental

---

[4] Discovery may reveal that additional representations should be included within the scope of the allegations in this Complaint, and Plaintiff reserves the right to add such representations.

[5] Ducktrap, *Ducktrap-Setting the Standard for American Smoked Seafood since 1978*, YouTube (Feb. 25, 2020), https://www.youtube.com/watch?v=1HegI15kFfM (emphasis added).

[6] Ducktrap River of Maine (@ducktraoriverofmaine), Facebook (June 8, 2020), https://facebook.com/ducktrapriverofmaine/photos/a.356103654464458/3001420003420039984I793/?type=3&theater emphasis added); Ducktrap River of Maine (@ducktrapriverofmaine), Instagram (June 8, 2020), https://www.instagram.com/p/CBMR63IM-ye/ (emphasis added).

[7] Ducktrap River of Maine (@ducktraoriverofmaine), Facebook (April 21, 2020), https://facebook.com/ducktrapriverofmaine/photos/a.356I93654464458/2884637301620068/?type=3&theater (emphasis added); Ducktrap River of Maine (@ducktrapriverofmaine), Instagram (April 21, 2020), https://www.instagram.com/p/B_PwyAaA9GG (emphasis added).

benefits." The FTC has "admonished" companies for using unqualified claims such as "sustainable" and "eco-friendly" due to the FTC's determination that "it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims."[8]

30.    The FTC's Guides for the Use of Environmental Marketing Claims specifically states that the term "eco-friendly," when used without qualification, is "deceptive" because it "likely conveys that the product has far-reaching environmental benefits and may convey that the product has no negative environmental impact."[9]

31.    Studies have concluded that claims such as "sustainably produced" are perceived by many consumers to mean "produced according to higher animal welfare standards."[10]

32.    Consumers have ranked the "minimal use of hormones and drugs," "no pollution to the environment," and "respect of fish welfare" as three of the four most important elements of sustainable aquaculture.[11]

33.    Moreover, a study on consumer perception of the phrase "ecologically sustainable" found that a majority of consumers "expect eco-labelled seafood to be harvested in a way that reduced impact on the fish population or the marine environment."[12]

---

[8] Ducktrap River of Maine (@ducktraproriverofmaine), Facebook (Apr. 22, 2015), https://facebook.com/ducktraproriverofmaine/photos/a.356I93654464458/8I4029975347488/?type=3&theater (emphasis added).
[9] 16 C.F.R. § 260.4 (2012); *see also FTC Issues Revised "Green Guides",* Federal Trade Commission (Oct. 1, 2012), https://www.ftc.gov/news-events/press-releases/2012/IO/ftc-issues-revised-green-guides ("Very few products, if any, have all the attributes consumers seem to perceive from [claims such as 'eco-friendly'], making these claims nearly impossible to substantiate.").
[10] Katrin Zander et al., *Consumers' Willingness to Pay for Sustainable Seafood Made in Europe,* 30 J. lnt'l Food & Agribusiness Marketing 251 (Dec. 22, 2017).
[11] *Id.*
[12] Loren McClenachan et al., *Fair Trade Fish: Consumer Support for Broader Seafood Sustainability,* 17 Fish & Fisheries 825 (Sept. 2016).

C.    **The Products are Sourced from Salmon Farmed Using Unsustainable and Environmentally Destructive Practices.**

34.    Defendants' Sustainability Representations suggest to consumers that the Products are sustainably sourced in accordance with higher environmental and animal welfare practices, but in reality, the Products are sourced from salmon that are farmed using unsustainable and environmentally destructive practices.

35.    The Products are made from salmon that are sourced from Defendants' industrial fish farms in Chile, Scotland, Iceland, and Norway.[13]

36.    Defendants use vast quantities of wild-caught fish as feed for the salmon they raise. Salmon are carnivores and require over a pound of wild fish for every pound of weight they gain.[14] Accordingly, experts have determined that the use of wild fish in aquaculture feed is "unsustainable for ocean ecosystems."[15]

37.    Defendants use an ecologically dangerous method of salmon farming known as "open net pen aquaculture," in which more than 70,000 salmon may be confined in a single "pen".[16] This practice has been banned in numerous jurisdictions due to concerns over environmental risks.[17]

---

[13] Smoked Salmon, Ducktrap River of Maine, http://ducktrap.com/products/smoked-salmon/ (last visited July 28, 2020).

[14] *Aquaculture: Wild Fish,* Monterey Bay Aquarium Seafood Watch, https://www.seafoodwatch.org/ocean-issues/aquaculture/wild-fish (last visited July 28, 2020).

[15] Jillian P. Fry et al., *Environmental Health Impacts o fFeeding Crops to Farmed Fish,* Env. lnt'l, May 2016, at 20 I-I4, https://www.sciencedirect.com/science/article/pii/SO160412016300587.

[16] *Escape Calls High Energy Salmon Sites Into Question,* The Fish Site (Jan. 20, 2020), https://thefishsite.com/articles/mowi-reports-mass-salmon-escape-from-colonsay.

[17] *See* Lynda V. Mapes, *Fish Farm Objects, But Washington State Says It's Overfor Atlantic Salmon Pens at Port Angeles,* Seattle Times (Dec. 19, 2017, 5:29 PM), https://www.seattletimes.com/seattle-news/environment/state-says-decision-to-terminate-port-angeles-atlantic-salmon-farm-is-final ("Atlantic salmon farming in open-water net pens is banned in California and Alaska and not practiced in Oregon."); Ben Fisher, *Washington Governor Jay Inslee Signs Bill Banning Atlantic Salmon Farming,* SeafoodSource (Mar. 23, 2018), https://www.seafoodsource.com/news/aquaculture/washington-govemor-jay-inslee-signs-bill-banning-atlantic- salmon-farming; Lynda V. Mapes, *Fish Farm Caused Atlantic Salmon Spill Near San Juans, Then Tried to Hide How Bad It Was, State Says,* Seattle Times (Feb. 2, 2018, 11:23 PM), https://www.seattletimes.com/seattle-news/fish-farm- caused-atlantic-salmon-spill-state-says-then-tried-to-hide-how-bad-it-was/; Craig Medred, *The Failed Ban,* Craig Medred (Oct. 13, 201 9), https://craigmedred.news/20 I 9/10/13/the-failed-ban/.

38.     Because open net pens are directly connected to the broader marine environment, experts have concluded that diseases and escaped salmon may spread from the farms into the environment and that "risks of damage to wild salmon populations, ecosystems, and society are large."[18]

### 1.     Animal Welfare.

39.     Defendants' standard business practices inflict unnecessary suffering on their salmon contrary to Mowi's Sustainability Representations.

40.     The conditions at Defendants' facilities in Scotland have been rated by animal charity OneKind as some of the industry's worst due to mortality rates, parasite infestations, stress levels, overstocking, genetic deformities, and escapes, among other factors.[19] Overall, Mowi was ranked second-worst out of eight farmed fish producers on animal welfare.

41.     Mowi has even been reprimanded by the UK's Animal and Plant Health Agency for failing to protect lice-eating fish from "suffering [and] disease at its salmon farms in Scotland.[20]

42.     Mowi's method of net pen aquaculture leaves the salmon vulnerable to massive "die-off" events from various cases.

43.     Indeed, between July and September 2019, approximately 737,000 salmon from 12 separate fish farms owned and operated by Mowi in Scotland were killed by algae blooms, poor

---

[18] Rosamond Naylor et al., *Fugitive Salmon: Assessing the Risks of Escaped Fish from Net-Pen Aquaculture,* 55 BioScience 427 (May 2005), https://academic.oup.com/bioscience/article/55/5/427/226100.
[19] Rob Edwards, *Revealed:  The Fish Farms Worst on Animal Welfare,* The Ferret (Aug. 5, 2018), https ://theferret. scot/fish-farms-worst-animal-welfare/.
[20] Rob Edwards, *Salmon Farming Firm Under Fire over Fish Welfare After 700,000 Deaths,* The Ferret (Nov. IO, 2019),  https://theferret.scot/mowi-fish-farming-deaths/.

health, and disease.[21] In May 2020, 1.5 million juvenile salmon died in Mowi's new hatchery in Northern Norway. [22]

44.     The extremely crowded and unsanitary environment that the salmon are raised in is nothing like the natural environment in which the salmon would be raised in the wild.

45.     Scientists characterize the crowded production methods used by companies like Defendants as "stressful high-density conditions" that far exceed what salmon would experience in the wild.[23]

46.     Salmon in these crowded environments become highly aggressive and cause harm to each other as a result.[24]

47.     Defendants' crowded conditions are made more stressful by the fact that the barren tanks provide no environmental variety that would be present in a natural habitat.  As a result, there are no opportunities for the fish to seek shelter from each other.  Research suggests that fish raised on farms without such enrichments experience significantly higher stress levels and are subjected to more violent aggression from other fish.[25]

### 2.     Use of Artificial Chemicals.

48.     The unnaturally crowded and unsanitary conditions at Defendants' facilities are made possible by Defendants' use of a wide range of antimicrobial drugs that pose risks to human health and the environment.

---

[21] *Id.*

[22] Editorial Staff, *1.5 Million Juvenile Salmon Have Died in Mowi's Brand New Hatchery,* SalmonBusiness (May 27, 2020), https://salmonbusiness.com/fish-mortality-in-mowis-new-hatchery/.

[23] Alison C. Harvey, *Does Density Influence Relative Growth Performance o fFarm, Wild and Fl Hybrid Atlantic Salmon in Semi-Natural and Hatchery Common Garden Conditions?,* 3 Royal Soc. Open Sci. I (July 2016), https://www.ncbi.ulm.nih.gov/pmc/articles/PMC4968464/.

[24] Joacim Naslund et al., *Hatchery Tank Enrichment Affects Cortisol Levels and Shelter-Seeking in Atlantic Salmon(Salmosalar),* 70 Can.J.Fisheries&AquaticSci.585(Feb.2013),https://www.researchgate.net/publication/236I552 82_Hatchery_tank_enrichment_affects_cortisol_levels_and_shelter seeking_in_Atlantic_salmon_Salmo_salar.

[25]*Id.*

49.     Antibiotic use in farming contributes to the emergence of antimicrobial resistance in bacteria that may be transferred to humans, thereby reducing the effectiveness of antibiotic drugs for treating human disease.[26]

50.     According to the Centers for Disease Control, "Antibiotic resistance-the ability of germs to defeat the drugs designed to kill them—is one of the greatest global public health challenges of our time."[27] More than 2.8 million antibiotic-resistant infections occur in the United States each year, and more than 35,000 people die as a result.[28] In 2019, the World Health Organization ("WHO") characterized antibiotic resistance as "one of the most urgent health risks of our time" and as an "invisible pandemic," with the emergence of infections that are untreatable by all classes of antibiotics.[29]

51.     Defendants' own audit documents[30] show that Mowi treats its salmon with the antibiotics florfenicol, oxytetracycline, and sulfemerazine.  These antibiotics are all considered "highly important" for human medicine by the WHO.[31]

52.     Defendants' audit records show that Mowi's fish are also administered the sedative drug tricaine mesylate.

53.     The records further demonstrate that Defendants' fish are fed a semi-synthetic insecticide, emamectin benzoate.

---

[26] *Antimicrobial Resistance,* U.S. Food & Drug Administration, https://www.fda.gov/animal-veterinary/safety-health/antimicrobial-resistance (last visited July 28, 2020).

[27] Centers for Disease Control, *Antibiotic Resistance Threats in the United States, 2019,* at 3, https://www.cdc.gov/dmgresistance/pdf/threats-report/2019-ar-threats-report-508.pdf.

[28] *Id.* at vii.

[29] World Health Organization, *In the Face of Slow Progress, WHO Offers a New Tool and Sets a Target to Accelerate Action Against Antimicrobial Resistance* (June 18,2019), https://www.who.int/news-room/detail/18-06- 2019-in-the-face-of-slow-pro gress-who-offers-a-new-tool-and-sets-a-target-to-accelerate-action-against- antimicrobial-resistance.

[30] *See ASC Dashboard,* Mowi, https://mowi.com/sustainability/aquaculture-stewardship-council/asc-dashboard/ (last visited July 28, 2020).

[31] World   Health   Organization, *Critically Important Antimicrobials for Human Medicine* (2016), https://apps.who.int/iris/bitstream/handle/10665/325036/WHO-NMH-FOS-FZD- 19. 1-eng.pdf?ua= I.

54.     Defendants also use chemical disinfectants, including formaldehyde-based formalin (a known carcinogen) and bleach.[32]

55.     Defendants have repeatedly failed to report chemical use and the presence of dangerous pathogens, in violation of the Aquaculture Stewardship Council Standards.[33]

56.     In May 2019, it was revealed that Mowi was under investigation by the Scottish Environment Protection Agency for failing to accurately report widespread use of medications and chemical treatment in its salmon farming operations.[34]

57.     In January 2020, Russia banned salmon from Defendants' facilities in Chile due to "alleged detection of substances such as crystal violet (a moderate-strength disinfectant also known as gentian violet) and the antibiotic oxytetracycline in fish samples tested" by Russia's veterinary authority.[35]

58.     The Monterey Bay Aquarium Seafood Watch ("Seafood Watch") specifically warns consumers to avoid salmon from the locations where the Products are sourced due to sustainability concerns.[36]

59.     For example, Atlantic salmon farmed in marine net pens in Chile are on the "Avoid" list.  As Seafood Watch explains: "The high volume of antibiotics and pesticides that are used to control diseases and sea lice parasites is a critical concern.  In addition, the dominant antibiotic

---

[32] Lucy Adams, *Salmon Farming Giant Mowi Probed Over Chemical Use,* BBC (May 20, 2019), https://www.bbc.com/news/uk-scotland-48334029; Billy Briggs, *Chemical Fears at Scots Fish Farms,* The Times (July 21, 2019, 12:01 AM), https://www.thetimes.co.uk/article/chemical-fears-at-scots-fish-farms-mlh6smzj6.

[33] *See ASC Dashboard, supra* note 35.

[34] Adams, *supra* note 37.

[35] Jonathan Garces, *Two Chilean Salmon Farmers Allowed Back Into Russia,* Fish Farming Expert (Mar. 9, 2020, 1:05 PM), https://www.fishfanningexpert.com/article/two-chilean-salmon-farmers-allowed-back-in-mssian-market/; Editors, *Russia Bans Mowi Chile Salmon,* Fish Farming Expert (Jan. 31, 2020, 6:04 PM), https://www.fishfarmingexpert.com/article/mssia-bans-mowi-chile-salmon/.

[36]*SalmonRecommendations,*MontereyBay Aquarium Seafood Watch, https://www.seafoodwatch.org/seafood-recommendations/groups/salmon?q=atlantic%20salmon&t=atlantic%20salmon&type=atlantic&o= I33,5I7,520,787274843,1555785386 (last visited July 28, 2020).

treatments, florfenicol and oxytetracycline, are listed as highly important for human medicine by the World Health Organization.  Antibiotics and pesticides are both used, on average, more than two times per production cycle."[37]

60.     Atlantic salmon farmed in marine net pens in Norway (except the Skjerstad Fjord) and Scotland (except the Orkney Islands) are also on the "Avoid" list.  As Seafood Watch explains: "The overuse of chemicals is…a high concern for [these] other sources.  In Norway and Scotland, escapes of farmed salmon are a major risk to the genetic composition and fitness of wild, native salmon populations.  For all sources except Chile, disease impacts on wild fish are a high rated concern too."[38]

61.     Thus, Mowi's marketing of the Products—which suggests on the packaging to consumers that the Products are made from salmon that are sustainably sourced in accordance with higher environmental and animal welfare standards—is false and misleading.

II.     **Mowi's Natural Representations are False and Misleading.**

   A.     **Mowi makes Natural Representations on its Packaging and Through Online Media.**

---

[37] *Id.*
[38] *Id.*

62.     The retail packaging of the Products features the claim "All Natural":



63.     Similarly, the Ducktrap Twitter and Instagram pages state: "All natural smoked seafood - Atlantic Salmon ... - quality you can taste with every bite!"[39]

---

[39] Ducktrap River (@DucktrapRiver), Twitter, https://twitter.com/ducktrapriver?lang=en (last visited July 28, 2020);DucktrapRiverofMaine (@ducktrapriverofmaine),  Instagram, https://www.instagram.com/ducktrapriverofmaine/ (last visited July 28, 2020).

**B.**   **Mowi's Natural Representations Suggest to Consumers that the Products are Made from Salmon that are not Treated with Artificial Chemicals.**

64.    Consumer perception studies demonstrate that consumers believe that "all natural" fish products are made from fish that are not treated with artificial chemicals such as antibiotics and pesticides.

65.    For example, a 2015 nationally representative consumer survey conducted by Consumer Reports Survey Group found that 57% of consumers believe the claim "natural" on food labels means that "no antibiotics or other drugs were used."[40]

66.    The same survey also found that 63% of consumers think that the "natural" label on packaged foods means that "no toxic pesticides were used."[41]

**C.**   **The Products Are Made from Salmon that are Treated with Artificial Chemicals.**

67.    Mowi leads consumers to believe that its Products are "All Natural" or "100% All Natural," but in reality, the Products are made from salmon industrially farmed in facilities where the fish are treated with artificial chemicals such as antibiotics and pesticides.

68.    Artificial chemicals are used extensively in industrial salmon farming because the unnatural, crowded conditions to which farmed salmon are subjected impair their health and subject them to infection, parasite infestation, and other adverse health conditions.

69.    As set forth *supra* ¶¶ 58-60, Seafood Watch specifically warns consumers to avoid salmon from the locations where the Products are sourced, in large part due to concerns about the overuse of artificial chemicals.

---

[40] Consumer Reports National Research Center, *Natural Food Labels Survey: 2015 Nationally-Representative Phone Survey,* at 4, https://foodpolitics.com/wp-content/uploads/Consumer-Reports-Natural-Food-Labels-Survey-Report.pdf.
[41] *Id.* at 6.

70.     As set forth *supra* ¶¶ 48-60,  Mowi's own audit documents show that it treats its salmon with the antibiotics florfenicol, oxytetracycline, and sulfemerazine (all rated as "highly important for human medicine" by the WHO); its fish are administered the sedative drug tricaine mesylate; and its fish are fed a semi-synthetic insecticide, emamectin benzoate. Mowi also uses chemical disinfectants, including formaldehyde-based formalin (a known carcinogen) and bleach.

71.     Thus, Mowi's marketing of the Products-which suggests to consumers that the Products are made from salmon that are all natural and not treated with artificial chemicals-is false and misleading.

### III.     Mowi's Maine Representations are False and Misleading.

72.     The retail packaging of the Products features the label "Naturally Smoked Salmon FROM MAINE."




73.     The Ducktrap Facebook "About" page describes the Products as "The finest naturally smoked seafood from the coast of Maine."[42]

74.     Mowi's Maine Representations tend to mislead consumers into believing that the Products are made from salmon that are sourced from Maine or off the coastline of Maine.

75.     Contrary to Mowi's Maine Representations, as set forth *supra* ¶ 35, the Products are sourced from Mowi's industrial salmon farming facilities in Chile, Scotland, Iceland, and Norway.

76.     Thus, Mowi's marketing of the Products-which tends to mislead consumers into believing that the Products are made from salmon that are sourced from Maine or off the coastline of Maine-uses deceptive and/or ambiguous representations and omits material information about the geographic origin of the salmon used in the Products.

### *Mowi Continue to Falsely and Misleadingly Market the Products*

77.     Mowi continues to falsely and misleadingly market, advertise, package and/or sell the Products to the general public with the Sustainability Representations; Natural Representations; and Maine Representations.   The only conceivable purpose for falsely and deceptively making these claims about the Products is to stimulate sales and enhance Mowi's profits.

78.     Consumers are particularly vulnerable to these kinds of false and deceptive labeling and marketing practices.  Most consumers are unable to verify that products, such as Defendants', are accurately labeled.

---

[42]DucktrapRiverofMaine(@ducktraOpriverofmaine),*About,*Facebook
https://www.facebook.com/pg/ducktrapriverofmaine/about/?ref=page_internal/(last   visited   July   28,   2020)
(emphasis added).

79.     Because of Defendants' deceptive advertising practices, consumers were and continue to be fraudulently induced to purchase and pay a premium for the Products.

***Plaintiff Relied Upon the Products' Label***
***to Purchase and Use the Products***

80.     Plaintiff was itself a victim of Defendants' mislabeling of the Product.

81.     On several occasions over the last two years, and most recently in or around September of 2020, Plaintiff purchased the Products from Sysco and Ginsberg's Foods.

82.     Plaintiff purchased the Products in reliance of the Sustainability Representations; Natural Representations; and Maine Representations, as marketed on the packaging of the Products.

83.     Plaintiff would not have purchased the Products had it known that the Sustainability Representations; Natural Representations; and Maine Representations were false and misleading.

84.     Plaintiff is in the same proposed Class as all other consumers who purchased Defendants' Products during the relevant time period.  Plaintiff and the proposed Class Members were in fact misled by Defendants' misrepresentations in respect to the Products.  Plaintiff and the proposed Class Members would have purchased other salmon products, if any at all, if they had not been deceived by the misleading and deceptive labeling and advertising of these particular Products.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

86.     Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.  The class definition(s) may depend on

the information obtained throughout discovery.  Notwithstanding, at this time, Plaintiff brings this action and seeks certification of the following proposed Classes:

> **National Class:**  All persons or entities within the United States who purchased the Products with any of the Sustainability Representations; Natural Representations; and Maine Representations on the packaging from the beginning of any applicable limitations period through the date of class certification (the "National Class" or the "Class").

> **Consumer Fraud Multi-State Class:**  All persons or entities in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Rhode Island, Washington and Wisconsin who purchased the Products with any of the Sustainability Representations; Natural Representations; and Maine Representations on the packaging from the beginning of any applicable limitations period through the date of class certification (the "Consumer Fraud Multi-State Class").

> **New York Sub-Class:**  All persons or entities in New York who purchased the Products with any of the Sustainability Representations; Natural Representations; and Maine Representations on the packaging from the beginning of any applicable limitations period through the date of class certification (the "New York Sub-Class").

87.    Excluded from the proposed Classes are the Defendants, and any entities in which the Defendants have a controlling interest, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and Plaintiff's counsel, their staff members, and their immediate family.

88.    Plaintiff reserves the right to amend the Class definitions or add a Class if further information and discovery indicate that the Class definitions should be narrowed, expanded, or otherwise modified.

89.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

90.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in the thousands to hundreds of thousands. The number of

members of the Classes is presently unknown to Plaintiff but may be ascertained from Defendants'

books and records.  Members of the Classes may be notified of the pendency of this action by mail,

email, Internet postings, and/or publication.

91.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2)
and 23(b)(3).**  Common questions of law and fact exist as to all members of the Classes and

predominate over questions affecting only individual members of the Classes.   Such common

questions of law or fact include, but are not limited to, the following:

a.      Whether Defendants had a reasonable basis for claiming the Sustainability
        Representations; Natural Representations; and Maine Representations;

b.      Whether the marketing, advertising, packaging, labeling, and other
        promotional materials for the Products are deceptive;

e.      Whether Defendants' actions violate the state consumer fraud statutes
        invoked below;

f.      Whether Defendants' actions constitute common law fraud;

g.      Whether Plaintiff and the members of the Classes were damaged by
        Defendants' conduct;

h.      Whether Defendants were unjustly enriched at the expense of Plaintiff and
        Class Members;

i.      Whether Defendants breached express warranties to Plaintiff and Class
        Members;

j.      Whether Defendants breached implied warranties to Plaintiff and Class
        Members; and

k.      Whether Plaintiff and Class Members are entitled to injunctive relief.

92.     Defendants engaged in a common course of conduct giving rise to the legal rights

Plaintiff seeks to enforce, on behalf of itself and the other Members of the proposed Classes.

Similar or identical statutory and common law violations, business practices, and injuries are

involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

93.     **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Classes because, among other things, all Members of the Classes were comparably injured through Defendants' uniform misconduct described above. Further, there are no defenses available to Defendants that are unique to Plaintiff or to any particular Members of the Classes.

94.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Members of the Classes it seeks to represent; it has retained counsel competent and experienced in complex class action litigation; and it will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and the undersigned counsel.

95.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Classes would continue to suffer the harm described herein, for which they would have no remedy.  Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

96.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other

Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, Plaintiff seeks to certify a Class to enjoin Defendants from selling or otherwise distributing the Products as labeled until such time that Defendants can demonstrate to the Court's satisfaction that the Products confer the advertised health or medicinal benefits.

97.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Members of the Classes to individually seek redress for Defendants' wrongful conduct.  Even if Members of the Classes could afford individual litigation, the court system could not.  Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### Count I

**Violation of the State Consumer Fraud Acts**
**(On Behalf of the Consumer Fraud Multi-State Class)**

98.     Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

99.     The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

100.    Plaintiff and the other Members of the Consumer Fraud Multi-State Class have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class because Plaintiff and Members of the Consumer Fraud Multi-State Class have suffered an injury in fact and lost money as a result of Defendants' actions set forth herein.

101.    Defendants engaged in unfair and/or deceptive conduct by, *inter alia*, making the Sustainability Representations; Natural Representations; and Maine Representations.

102.    Defendants intended that Plaintiff and each of the other Members of the Consumer Fraud Multi-State Class would rely upon its unfair and deceptive conduct and a reasonable consumer would in fact be misled by this deceptive conduct described above.

103.    Each of the Members of the Consumer Fraud Multi-State Class relied upon Defendants' unfair and deceptive conduct alleged herein in purchasing the Products.

104.    As a result of Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

105.    In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**Count II**

**Violation of the New York Deceptive Trade
Practices Act, New York Gen. Bus. Law § 349, *et seq.*
(In the Alternative to Count I and on behalf of the New York Sub-Class)**

106.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

107.    By reason of the acts set forth above, Defendants have been and are engaged in deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

108.    Defendants engaged in unfair and/or deceptive conduct by, *inter alia*, making the Sustainability Representations; Natural Representations; and Maine Representations.

109.    The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendants' false, deceptive, or misleading statements implicate the health and safety of those consumers deceived by Defendants.

110.    Defendants direct their conduct at consumers, as Defendants' false, deceptive, or misleading statements are contained in marketing targeted toward consumers, including social media and retail product packaging. As such, Defendants' conduct as alleged herein is consumer oriented.

111.    Defendants' deceptive acts are likely to mislead a reasonable consumer acting reasonably under the circumstances.

112.    Defendants' deceptive acts affect the public interest in the state of New York because, upon information and belief, consumers located in New York have purchased Defendants' Products in reliance on Defendants' false, deceptive, or misleading statements.

113.    As a result of Defendants' use or employment of unfair or deceptive acts or

business practices, Plaintiff and each of the other Members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

## Count III

### Violation of the New York Deceptive Trade Practices Act, New York Gen. Bus. Law § 350, *et seq.* (In the Alternative to Count I and on behalf of the New York Sub-Class)

114.    Plaintiff repeats and re-alleges each of the allegations set forth in each of the paragraphs above and incorporates them by reference.

115.    Defendants have made material, false or misleading statements or representations of fact about the Products. Specifically, Defendants have literally, impliedly, or by necessary implication made the Sustainability Representations; Natural Representations; and Maine Representations, none of which are true.

116.    Defendants' acts constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in the state of New York in violation of New York's General Business Law § 350.

117.    The public is likely to be damaged because of Defendants' deceptive trade practices or acts. Specifically, Defendants' false or misleading statements implicate the health and safety of those consumers deceived by Defendants.

118.    As such, Defendants' conduct as alleged herein is consumer oriented.

119.    As a result of Defendants' material, false or misleading statements or representations of fact about the Products, Plaintiff and each of the other Members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

## Count IV

**Breach Of Express Warranty
(On Behalf Of The National Class)**

119. Plaintiff repeats and re-alleges each of the allegations set forth in each of the paragraphs above and incorporates them by reference.

120. Plaintiff, and each member of the National Class, formed a contract with Defendants at the time Plaintiff and the other members of the National Class purchased the Products. The terms of the contract included the promises and affirmations of fact made by Defendants on the Products' packaging and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of bargain, and are part of the standardized contract between Plaintiff and the members of the National Class and Defendants.

121. Plaintiff and the National Class performed all conditions precedent to Defendants' liability under this contract when they purchased the Products.

122. Defendants breached express warranties about the Products and their qualities because Defendants' statements about the Products were false and the Products do not conform to Defendants' affirmations and promises as described above.

123. Had they known the true nature of the Products, Plaintiff and each of the members of the National Class would not have purchased the Products.

124. As a result of Defendants' breach of warranty, Plaintiff and each of the members of the National Class have been damaged in the amount of the purchase price of the Products and any consequential damages resulting from their purchases.

125.    On September 15, 2020, Plaintiff mailed a notice letter to Defendants. The letter was sent on behalf of Plaintiff and all other persons similarly situated. Mowi responded to Plaintiff's letter on September 30, 2020 and rejected Plaintiff's allegations.

126.    Furthermore, Defendants had actual knowledge the breaches alleged herein regarding the Products purchased by Plaintiff, as well as the Products purchased by other members of the National Class, because it had knowledge since *at least* earlier this year based on the lawsuit styled *Organic Consumers Association, et al. v. Mowi ASA, et al.*, 2020 CA 003368 B (Superior Court of the District of Columbia).

**Count V**

**Breach of Contract/Common Law Warranty**
**(On Behalf of the New York Sub-Class)**

127.    Plaintiff repeats and re-alleges each of the allegations set forth in each of the paragraphs above and incorporates them by reference.

128.    Plaintiff brings this cause of action on behalf of itself and the New York Sub-Class against Defendants.

129.    To the extent Defendants' commitment is deemed not to be a warranty under New York's Uniform Commercial Code, Plaintiff pleads in the alternative under common law warranty and contract law.

130.    Plaintiff and New York Sub-Class Members purchased the Products either directly from Defendants or through foodservice distributors and retailers.

131.    Defendants purport through their advertising and packaging to create express warranties and/or contract that the Products were "sustainably sourced," "All Natural," and "from Maine" and not made from salmon industrially farmed outside of the United States.

132.    Defendants made the foregoing express representations and warranties and/or contract to all consumers, which became the basis of the bargain between Plaintiff, New York Sub-Class Members and Defendants.

133.    All conditions precedent to Defendants' liability under this warranty and/or contract were performed by Plaintiff and the New York Sub-Class when they purchased the Products and used the Products as directed.

134.    Defendants breached the warranties and/or contract about the Products and their qualities because Defendants' statements about the Products were false and the Products do not conform to Defendants' affirmations and promises described above. Plaintiff and the New York Sub-Class Members would not have purchased the Products had they known the true nature of the Products and the misstatements regarding what the Products were. This substantially and/or completely impairs the use and value of the Products, which were not discoverable by Plaintiff and New York Sub-Class Members at the time of their purchase of the Products.

135.    As a direct and proximate cause of Defendants' breach of warranty and/or contract, Plaintiff and the New York Sub-Class Members were harmed because they would not have purchased the Products if they had known the truth about the Products.

136.    As a result of Defendants' breach of warranty and/or contract, Plaintiff and the New York Sub-Class have been damaged in the amount of the purchase price of the Products and any consequential damages resulting from the purchases.

### Count VI

**Breach of Implied Warranty**
**(On Behalf of the Nationwide Class and/or the New York Sub-Class)**

137.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

138.    Plaintiff brings this claim against Defendants on behalf of itself, and on behalf of the Nationwide Class and/or, the New York Sub-Class (for purposes of this Count, the "Classes").

139.    At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used, and that products be acceptable in trade for the products' description.

140.    Defendants are in the business of manufacturing, supplying, marketing, advertising, warranting, and selling the Products.  Defendants impliedly warranted to Plaintiff and Members of the Classes that the Products were of a certain quality and were fit for their ordinary and particular purpose.

141.    The Products were unfit for their ordinary use and were not of merchantable quality and/or did not conform to the promises or affirmations of fact made on the label, as warranted by Defendants.  Prior to purchase, Plaintiff and the Members of the Classes could not really have discovered that the Products were not fit for their ordinary purpose and did not conform to the quality previously represented.

142.    Similarly, the Products were unfit for their particular purpose.  At the time Plaintiff and Members of the Classes purchased the Products, Defendants knew or should have known that Plaintiff and the Members of the Classes would purchase the Products because they are labeled and advertised with the Sustainability Representations; Natural Representations; and Maine Representations.  However, Defendants' Products are not suitable for this purpose at the point of sale because they did not confer any of these benefits.

143.    The Products were unfit for their ordinary use and were not of merchantable quality and/or did not conform to the promises or affirmations of fact made on the label and were unfit for their particular purpose when they left Defendants' control.

144.    Plaintiff and Members of the Classes would not have purchased the Products if they knew they did not confer any of the promised benefits.

145.    Accordingly, Plaintiff and the Members of the Classes did not receive the benefit of their bargain in purchasing the Products.

146.    Defendants' conduct described in this Complaint constitutes a breach of implied warranties under UCC §§ 2-314 and 2-315, as adopted by the following state statutes:

Ala. Code § 7-2-314, et seq.; Alaska Stat. § 45.02.314, et seq.; Ariz. Rev. Stat. § 47-2314, et seq.; Ark. Code § 4-2-314, et seq.; Cal. Com. Code § 2314, et seq.; Colo. Rev. Stat. § 4-2-314, et seq.; Conn. Gen. Stat. § 42a-2-314, et seq.; 6 Del. C. § 2-314, et seq.; D.C. Code § 28:2-314, et seq.; Fla. Code § 672.314, et seq.; O.C.G.A. § 11-2-314, et seq.; Haw. Rev. Stat. § 490:2-314, et seq.; Idaho Code § 28-2-314, et seq.; 810 Ill. Comp. Stat. 5/2-314, et seq.; Ind. Code § 26-1-2-314, et seq.; Iowa Code § 554.2314, et seq.; Kan. Stat. § 84-2-314, et seq.; Ky. Rev. Stat. § 355.2-314, et seq.; La. Rev. Stat § 9:2800.53(6) , et seq.; 11 M.R.S.A. § 2-314, et seq.; Md. Code Ann., Com. Law § 2-314, et seq.; Mass. Code 106, § 2-314, et seq.; Mich. Comp. Laws 440.2314, et seq.; Minn. Stat. § 336.2-314, et seq.; Miss. Code § 75-2-314, et seq.; Mo. Rev. Stat. § 400.2-314, et seq.; Mont. Code § 30-2-314, et seq.; Neb. U.C.C. § 2-314, et seq.; Nev. Rev. Stat. § 104.2314, et seq.; N.H. Rev. Stat. § 382-A:2-314, et seq.; N.J. Stat. § 12A:2-314, et seq.; N.M. Stat. § 55-2-314, et seq.; N.Y. U.C.C. § 2-314, et seq.; N.C. Gen. Stat. § 25-2-314, et seq.; N.D. Cent. Code § 41-02-30, et seq.; Ohio Rev. Code § 1302.26, et seq.; Okla. Stat. Tit. 12A, § 2-314, et seq.; Or. Rev. Stat. § 72.3130, et seq.; 13 Pa. Cons. Stat. § 2314, et seq.; R.I. Gen. Laws § 6A-2-314, et seq.; S.C. Code § 36-2-313, et seq.; S.D. Codified Laws § 57A-2-313, et seq.; Tenn. Code § 47-2- 314, et seq.; V.T.C.A., Bus. & C. § 2.314, et seq.; Utah Code § 70A-2-314, et seq.; Vt. Stat. Tit. 9A, § 2-314, et seq.; Va. Code § 8.2-314, et seq.; Wash. Rev. Code § 62A.2-314, et seq.; W. Va. Code § 46-2-314, et seq.; Wis. Stat. § 402.314, et seq.; and Wyo. Stat. § 34.1-2-314, et seq.

147.    As a result of Defendants' breach of warranty, Plaintiff and each Member of the Classes have been damaged in an amount to be determined at trial and any consequential damages resulting from their purchases.

148.    On September 15, 2020, prior to filing suit, Plaintiff and Members of the Classes notified Mowi as to its breaches of warranty alleged herein. Mowi responded to the notice on September 30, 2020 and rejected Plaintiff's allegations.

## Count VII

### Fraud
### (On Behalf of the Nationwide and/or Multi-State Class and/or the New York Sub-Class)

149.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

150.    Plaintiff brings this cause of action on behalf of itself, the Nationwide Class and/or Multi-State Class and/or the New York Sub-Class against Defendants.

151.    As alleged herein, Defendants knowingly made material misrepresentations and omissions regarding the Products on the Products' labeling and packaging in the Products' advertisements, and/or on their website.

152.    Defendants made these material misrepresentations and omissions in order to induce Plaintiff and putative Class Members to purchase the Products.

153.    Rather than inform consumers that the Products are not made from salmon that are (i) sustainably sourced in accordance with higher environmental and animal welfare standards; (ii) all natural and not treated with artificial chemicals; and (iii) sourced from Maine or off the coastline of Maine, Defendants claim in marketing materials and their marketing campaign for the Products that the Products are "sustainably sourced," "All Natural," and "from the coast of Maine," in order to mislead consumers that the Products have those attributes.

154.    Defendants knew the Products were not made from salmon that are (i) sustainably sourced in accordance with higher environmental and animal welfare standards; (ii) all natural and not treated with artificial chemicals; and (iii) sourced from Maine or off the coastline of Maine, but nevertheless made such representations through the marketing, advertising and on the Products' labeling. In reliance on these and other similar misrepresentations, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Products.

155.    Had Plaintiff and the Class known the truth about the Products, they would not have purchased the Products.

156.    As a proximate result of the fraudulent conduct of Defendants, Plaintiff and the putative Class paid monies to Defendants, through their regular retail sales channels, to which Defendants are not entitled, and have been damaged in an amount to be proven at trial.

<u>**Count VIII**</u>

**Unjust Enrichment**
**(On Behalf of the Nationwide Class and/or Multi-State Class and/or New York Subclass)**

157.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

158.    Plaintiff brings this claim against Defendants on behalf of itself and the New York Sub-Class.

159.    Plaintiff and the other Members of the New York Sub-Class conferred benefits on Defendants by purchasing the Products.

160.    Defendants received the benefits to the detriment of Plaintiff and the other Members of the New York Sub-Class because Plaintiff and the other Members of the New York Sub-Class purchased mislabeled Products that are not what they bargained for and that did not provide any of the promised benefits.

161.    Defendants have been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiff and the other Members of the New York Sub-Class. Retention of those monies under these circumstances is unjust and inequitable because Defendants' labeling of the Products was misleading to consumers, which caused injuries to Plaintiff and the other Members of the New York Sub-Class, because they would have not purchased the Products had they known the true facts.

162.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the other Members of the New York Sub-Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the other Members of the New York Sub-Class for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of, all others similarly situated members of the Classes, pray for relief and judgment, including entry of an order:

A.    Declaring that this action is properly maintained as a class action, certifying the proposed Class(es), appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B.    Directing that Defendants bear the costs of any notice sent to the Class(es);

C.    Declare that Defendants must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Products, or order Defendants to make full restitution to Plaintiff and the members of the Class(es);

D.    An award of restitution and other appropriate equitable relief;

E.    An injunction against Defendants to enjoin them from conducting their business through the unlawful, unfair and fraudulent acts or practices set forth herein;

F.    A jury trial and damages according to proof;

G.    Awarding Plaintiff and members of the Class(es) statutory damages, as provided by the applicable state consumer protection statutes invoked above;

H.    Enjoining Defendants from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

I.    Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

J.    Civil penalties, prejudgment interest and punitive damages as permitted by law; and

K.      Ordering such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: November 5, 2020                  Respectfully Submitted,

By:  /s/ *Jonathan Shub*
Jonathan Shub (ID # 4747739)
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033
T:  856-772-7200
F:  856-210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Gary M. Klinger*
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Ste. 2100
Chicago, Illinois 60606
Phone: 202.640.1160
Fax: 202.429.2294
gklinger@masonllp.com

Gary E. Mason*
David K. Lietz*
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Ave. NW Ste. 305
Washington DC 20016
Phone: 202.640.1160
Fax: 202.429.2294
gmason@masonllp.com

*Attorneys for Plaintiff and the
Proposed Classes*

*\*Pro Hac Vice Applications Forthcoming*